The court will call the first case. Case number 17-0150. Good afternoon, everyone. Welcome to the Illinois Appellate Court, 1st District, 6th Division. We're going to ask the lawyers who are going to argue to please step up, introduce themselves, and tell us who you represent. Good afternoon, your honors. Tara Thompson on behalf of the appellant. Good afternoon. Assistant State's Attorney Brian Levitsky on behalf of the people of the state of Illinois. All right. Thank you, counsel. Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument. The appellant has 10 minutes for rebuttal. We may change that if we have a lot of questions or if things get repetitive. Please remember to speak loudly. Our microphones do not amplify well. They merely hear to record what is being said. And please understand, we have read the briefs. We understand the background and facts of the case. So devote your time to your strongest arguments. And Ms. Thompson, you may begin when ready. Thank you, your honor. Thank you, Ms. Thompson. We now know that the original jury hearing John Galvin's case in 1989 did not know at least three pieces of critical evidence that would have conclusively disproved the supposed confessions that were at the heart of the state's case back at the time of trial. Looking at all of this new evidence, these three pieces of evidence and everything else together, along with the old evidence, that's what Coleman directs this court to do, there is at least the reasonable likelihood that the outcome in this case would have been different and that the jury would have acquitted John Galvin and that they would do so at a future trial. The first and most important piece of new evidence is that this jury at the time of John Galvin's trial believed that fire science corroborated John Galvin's confession. That is what they heard from Mark Scheithauer and that is what they heard from the state in argument at trial. Now a jury hearing this case would know that either version of John Galvin's purported confessions are false. I mean, science tells us these are false. This is not the movies. We know now that a cigarette does not ignite gasoline, would not ignite really any flammable liquid. That's sort of what your experts said at the third stage hearing. Was there any counter-expert who opined differently to the effect that the evidence from 30 years ago was in fact correct? Absolutely not, Your Honor. And that's one of, I mean, the issue here is one of error and it's one of de novo review with respect to these issues because the Robocourt didn't say that they didn't credit Dr. Rubel's testimony. The issue is totally one of materiality, both for this arson testimony, for the other pieces of evidence that are at issue here. And so the question is would this have made a difference. There's no expert saying otherwise. Let me ask you, sorry to trouble you, but as far as the trial court's handling of this testimony by the new expert, what did the trial court actually say? Did they say they didn't find it credible? No, the court credited Dr. Rubel, but the court made two errors in assessing this portion of the testimony. For starters, the court said that this testimony could be squared with the original testimony from Mark Scheidhauer from the Bomb and Arson Unit. Specifically, the court said in its opinion that it believed that Dr. Rubel agreed with Mark Scheidhauer about where this fire began and that this fire could have began in the way that Mr. Galvin confessed to having done it. Both those things are belied by the record. These things are untrue. Mark Scheidhauer said that the evidence from this fire, these areas of deep burning and charring, is proof of where this fire began. And that appears to corroborate these purported confessions saying, you know, that from 20 plus feet away, Mr. Galvin and his compatriots were able to throw this beer bottle full of gasoline in a way that ignited this porch and that Mr. Galvin was able to follow that with a cigarette. Mark Scheidhauer told this jury, you know, you can tell where this fire began and that appears to corroborate these statements. What Dr. Rubel said is the most likely area of this fire having begun is actually on the stairs, not this area where Mark Scheidhauer originally told the jury it began. So that would contradict the theory that it was a cigarette thrown through a window from the ground up to the first floor window. Right. Or that the throwing was the thing that ignited this, that that's the area of origin. Now, to be sure, Dr. Ogle did say that especially looking at the testimony of Socorro Flores, and that's the woman that's across the alley making breakfast for her husband in the early morning hours, who observed something about this fire beginning. But in particular, when you take her testimony into account, which Dr. Ogle would, there's plenty of reason to think that this wasn't intentionally set fire. You know, this is not a case where an expert is now saying we have no idea what happened. But the question is really what was the mechanism? How did it begin? And Dr. Ogle is saying it's not in the way that Mr. Galvin confessed in either version. The other important difference in what Dr. Ogle had to say and where the other, the court's other error is, is this issue about the beer bottle. Because Dr. Ogle said that there's a lot of questions about this case. It simply wasn't investigated from an arson perspective in the way that modern arson investigators or scientists would examine it. But that it is extremely unlikely, if not, you know, impossible, that a fire of this magnitude could have started with this amount of gasoline. Because what Mr. Galvin is confessing to having done is taking, you know, a beer bottle's worth of gasoline. That's a very small amount of gasoline. And again, throwing it through this window onto a porch, and that's starting this conflagration. And Dr. Ogle's testimony, again, uncontroverted, is, says that that is almost impossible. That doesn't make any sense. Was there any proof of use of accelerant? It's unclear. And again, Dr. Ogle says that if you consider the testimony of the woman across the alley, you know, she says she sees something get thrown. She doesn't say it's a bottle. She doesn't say it's a lit object. She says she sees these kids in the alley messing with something, that they throw that into the, you know, the vicinity of the house, and that sometime after she observes a fire. And again, Dr. Ogle says, we have to take that into account. But what was that? Was that the fire beginning? Was that somebody adding to something they'd already done upstairs? We really don't know. But there is not corroboration for specifically the way that Mr. Galvin's confessions, or supposed confessions, appear to say this began. Ms. Thompson, let me veer off on a different direction for a moment. As we sit here today, I mean, there were a number of co-defendants who were charged at the same time as your client, correct? There were two others, Your Honor. All right. What's the status of them right now? Procedurally, Your Honor? Yes. Mr. Almendarez, who had the joint evidentiary hearing with Mr. Galvin, his case is currently on appeal as well. And my understanding is the briefing is behind Mr. Galvin's, and either his opening brief was just filed or maybe filed shortly. There was also a third co-defendant, Francisco Nanez, who is still represented by the public defender's office, who has a hearing that was ordered. There's the other opinion from the First District that our briefings allude to, and that hearing has not taken place yet. So the third defendant is now going to have a third stage hearing pursuant to an order of this court, is that correct? That's correct, Your Honor. Okay. And then the other, in the second defendant's case, is there an issue that's being argued about a confession coerced by torture or not? There is. There is, sorry. And that is? People. Yes. The physical coercion issue is because Arthur Almendarez was interrogated the same day as Mr. Galvin by the same group of people. And did Judge Joyce issue a separate opinion as to the second defendant's third stage hearing? The opinion is the same as the one for Mr. Galvin. Okay. But they were consolidated. It was one single hearing, right? That's correct, Your Honor. All right. Okay. But that appeal is lagging behind. Yes. I got you. Okay. Thank you. I've talked at length about the arson evidence, and there's more I can say about that, and I'm happy to answer questions about it. But I do want to move on to the issues involving Ms. Velez and Frank Partita. You know, to go to the second big point, this jury had only the sort of flimsy, uncorroborated motive evidence, again, from these purported confessions. And what John Galvin, the jury believed that John Galvin had said in these purported confessions was that this fire had something to do with John having a dispute with Villalobos, who lived in this building. Now, there was testimony at trial that there were no Villalobos who lived in this building, and that this, you know, there's nothing to corroborate that portion of the confession. What this jury did not know is that there was another person, this woman, Lisa Velez, who had a strong motive to have committed this crime, you know, the death of her brother by Latin Kings, who did live in this building. There was testimony about that at the original trial and more at this evidentiary hearing. And not only that she had this motive, but that she had stated her intent to multiple different people on various occasions, including right up until, you know, a week before the fire. That's what Jane Boreas testified to before the court below. And in fact — Why didn't she testify before? It is unclear. And this may be an issue of ineffective assistance of counsel. And it's one of, I think, the questions facing this Court is how — Wasn't some of that testimony barred by an evidentiary ruling at the original trial? Some of it — some of the issues related to Lisa Velez were barred. In particular, questions that were posed or attempted to be posed by counsel of this woman, Blanca Martinez, who was the sister of the victims and lived in the house. Testimony from her was barred and some evidence from Ms. Boreas was barred as well. There is — And do you argue that the order at the original trial barring that line of questioning, that threat of evidence, was improper? Well, what we do argue is — and again, the Nana's opinion from this Court is an unpublished opinion, but it sets forth the law that we're asking this Court to apply as well, which is there was a legal question at the time of trial as to whether Lisa Velez needed to be unavailable in order for this testimony to be admissible, you know, because counsel didn't call her. And there doesn't appear to be any evidence that they made an attempt to find her or that she was unavailable, you know, for purposes of hearsay. So there's a question about whether it was admissible then. It's certainly admissible now. There is — And that gets to my point. So if there's been a change in the rules of evidence, do you contend that that counts as newly discovered evidence under the Post-Conviction Act? Absolutely. Where does that get us? Absolutely. That makes it newly discovered and doesn't make it a counsel error for counsel having failed to done it. But if this Court believes there's any evidence from Jane Boreas or any of these other people that could have come in, then that is an ineffective assistance of counsel issue. The lower court, in their ruling rejecting this, actually didn't really rely so much on this issue of could counsel have done it or not. What the lower court said was they didn't think under the law that there was sufficient corroboration for — Wait a minute. Why wouldn't Velez's testimony be important? I mean, that was a really strong piece of evidence in terms of a motive and all of the other things. The only thing they had here was basically the defendant's confession, right? Nothing else. That in some — So it seems to me that your ineffective assistance of counsel argument with respect to not calling Velez to testify is important, wouldn't you say? Absolutely. But I just wonder, because you're not — you're kind of veering off of that. And the testimony from Boreas that Velez — and apparently she made this comment to several other people that she was going to burn the place down. Don't you think that that's something that the jury should have heard? No question, Your Honor. And I don't mean to veer away from this issue. What I'm saying is this Court can think about that in the context of actual innocence or an ineffective assistance of counsel claim. But the issue is really the same either way. It's one of materiality. Would this evidence have made a difference? I mean, that is the question at the heart of either of those claims. And I invite this Court to think about that from a newness perspective, however it wants to think about it. But either way, we're talking about what did the jury hear at trial versus what is available now. And that is the core standards question, really, for everything that this Court — that the lower court did. Because the lower court really said, I don't think this would have made a difference. In doing so, the court really substituted its own judgment about, you know, what would make a difference, about what it personally — what the court personally viewed the evidence to mean. And the court found this very torture path through, you know, comparing Scheidhauer and the arson testimony, looking at Lisa Velez, looking at Frank Partita, to say, I can see a route at which a jury reaches the right result. This Court knows under Coleman that that's not the standard for an actual innocence claim. It's not the standard for considering materiality at all. The question is, is it more likely than not that a jury looking at all of this evidence would reach a different result? I mean, the Court knows — I mean, this paragraph from Coleman, paragraph 97, a paragraph that I think about in my work all the time, is very clear about the standard. The standard is, is this evidence sufficient to undermine confidence in the outcome? We see that from Lisa Velez. We see that from the arson evidence. We see that from Frank Partita, despite the credibility rulings that the Court did make about Frank Partita and its personal view that it didn't believe him. That's also evidence that added with the rest of this would have made a difference. Let's talk a little bit about the defendant's claim. The defendant consistently claimed that his confession was coerced, right? From the very beginning. So how is it that the jury — well, he claimed that his lawyer told him that he couldn't testify to that at trial because, what, the jury wouldn't believe him or something like that. What was the reason? He did say that his lawyer encouraged him to downplay those issues because it was not something that a jury was going to credit. I mean, despite that, he did have a suppression hearing. He did testify about being physically coerced, and he did, you know, outcry to his family immediately after about what had happened in his interrogation. You started off by saying there were three things, one being the issue of the fire opinions and one being Ms. Velez and Ms. Vores. What's the third one you want to talk about? The third is Frank Partita. And that goes to the Court's question about what is the corroboration or the apparent corroboration for the supposed confessions. And the third thing is Jose Ramirez. You know, at the time of trial, this jury hears him say, I'm a kid from this neighborhood. I see kids coming out of the alley. One of them I know, John Galvin. He even claimed to be friendly with John Galvin, denied specifically in his testimony that he had been under the influence of any substances, even though obviously he's out at an extremely late hour coming home. Counsel, there is some inconsistency in Partita's testimony. At one time he said that it wasn't light enough for him to see the faces of the three people. And then later he said that he knew with certainty that the defendant wasn't present. Why wasn't he called to testify at trial? Because it seems to me like that inconsistency could have been resolved then. There is no answer for why he was not called to testify. And the best that we could do as Mr. Galvin's counsel today, we have an affidavit from his trial counsel saying that he really has no memory of any of the decision making that he made about this trial. So could his lawyer come to court now and explain why Frank Partita wasn't called? He couldn't. We're left to look at this record and determine whether there is any reasonable explanation that would satisfy, from an ineffective assistance of counsel perspective, a decision not to have done that. There is none in the record that I can see because Frank Partita is a credible person. He's an ex-Marine. He's the brother of police officers. This is not a, you know. There's one thing. Is it true or not true that the defense counsel did not know that Partita said the defendant was not in the alley? You know, that's a little bit confusing there. At one point he couldn't see. Was that ever disclosed to defense counsel? As far as we can see from these records, no. And maybe we're giving counsel too much credit because, you know, the ineffective assistance of counsel standard is what counsel could have done through the exercise of due diligence. What is clear from the police reports is that Frank Partita's name is there as a person who was potentially present. And that is something that Jose Ramirez himself even talks about, about seeing Frank Partita there on the street. So is that enough to tell counsel they should go talk to Frank Partita? Again, we leave that to this court to decide. If you're looking at this from an ineffective assistance of counsel perspective, there are not reports that say, you know, Frank Partita told the police that he got a look at these kids and one of them was not John Galvin. There's nothing in the report saying, you know, Jose Ramirez was drunk and high that night. You know, Frank Partita told us that. So those are the facts that counsel didn't know. Are you still asserting your Brady claim along those lines? We are. I mean, again, I think the court gets to the same place either way. Because we're right back to materiality. Would it have made a difference? But there's a Brady issue there too. If he told the police these things, certainly that is critical impeachment of Jose Ramirez that John Galvin never had at trial. I mean, John Galvin's lawyer is left to just ask Jose Ramirez the questions. And when he denies being drunk, when he denies, you know, not having the ability to see, they've got no ammunition with him. Frank Partita's the ammunition. And that's a person that this jury never preferred. Well, I think, you know, it's a little bit, if the defense counsel had known that Partita, who allegedly knew all of these players well, he knew them from the neighborhood, he'd been a little league coach or something. If the defense counsel knew with certainty that Partita said that the defendant was not in the alley, wouldn't that have been an important piece of evidence for the jury to hear? Without question. And it would have corroborated Socorro Flores. Again, the lady across the street making breakfast for her husband. She says, you know, she got the best look of these kids in the alley of anybody. And she said at trial and when she viewed a lineup with John Galvin in it, it's not John Galvin. So Frank Partita is essentially corroborating what another witness already told the jury. Let me ask you, you only have about three or four minutes left. Talk about the Batson issue a little bit more. Sure. John Galvin is in an unusual position for Batson claimants because obviously we're now, you know, 30 years later. You're interviewing a U.S. Supreme Court case. Exactly. Powers is decided while his case is on appeal. We have an affidavit from his now deceased appellate lawyer saying there's no reason I didn't raise that and I should have. The issues with the Batson claim are this. You know, this is not a question of whether or not Batson was even violated. This is a question of whether he made his prima facie case to demonstrate that there is an issue about race being a factor in jury selection. The best evidence of that, frankly, comes from the fact that, you know, we have these notes from the prosecutor where he was noting the race of all of the jurors. And, you know, there's recent Supreme Court cases about this, about notes with race being written down. And from a starting perspective, that's one thing we know. The second thing we know is all of the statistical information that we put in our briefs and that we argue below, which is there is a serious statistical disparity in the makeup of the persons on the veneer that are minorities and those people's selection into the jury. And there is certainly no law that says, you know, let one African-American person be on the jury. It doesn't matter if you, you know, violated Batson in striking the rest. You know, if you let two people be on the jury, you're safe. There's no requirement that it be 100 percent strikes. What you see here is a serious problem in the statistics for starters. The race of both the jury and the race of any sort of other demographic information of the people that were struck doesn't reflect any particular pattern in why these strikes were exercised. Those people come from different demographic situations. They're, you know, men and women, different ages. There's not something you can look at on the face of this cold record and say, well, here's what was going on. And so, again, that's the question of a prima facie case. Should there be a hearing where this prosecutor has to provide the race-neutral reasons for having done this so those can be assessed? On this record, absolutely. I'd like to ask you about the allegation of police pattern misconduct. Your opponent states that world does not apply here, and this is a totally different situation. The court found most of those, if not all of those gentlemen that testified, as to not be credible. Do you want to comment on that? Sure. And this does come back to the standard because, again, what the court erred in doing was saying whether he personally believed these people. There's some other credibility he frankly didn't comment on. But the question is, is an issue of did he believe these witnesses or what would the outcome be if a jury heard, you know, from 10 people, didn't know each other, have no particular reason to help John Galvin? Many of them said there wasn't anything in it for them. One of them even said, you know, I did the thing I was convicted of, but I'm here to tell you here's what happened when I was interrogated. The question is, would any of those people have influenced the jury in thinking about what happened with John Galvin's confession? And was it involuntary, as he said, or was it the result of a person just being confronted with the truth and hanging their head and admitting it as the officers tried to claim at trial? It's true we're not in a strictly a rural situation because rural is about, you know, whether there's an inference that should be drawn from the Fifth. But what is clear from this record is when these detectives testified at the evidentiary hearing below, they all said they had no memory of what happened. And, you know, the court can draw whatever conclusions it wants to from, you know, multiple people just having no other information to provide. But what is clear is that if there were a retrial, you know, these witnesses, these ten people, would testify about what happened to them. John Galvin would testify. Arthur Almendarez would testify. These officers don't have something to say to go against that. I mean, the question is, this is the record. And a court would take that into account along with all this other evidence and answer the question of which is more likely. Is it more likely that a jury would look at all of that evidence and say, yeah, you know, the reason John Galvin's confessions are false is because he had no clue how this fire began because this was involuntary. Or would they look at this and say, yeah, I don't buy a single word that any of those people said, and I think these officers are credible. That's the question. Is it more likely than not that a jury would quit John or that they would agree that this, you know, that this confession is good evidence that should be relied on to sustain a conviction? Even one of those people is enough. Let me ask you to bring your argument to a close, please. I will. I'll set up the rest of my time for rebuttal, Your Honor. Thank you. Mr. Levitsky, you're up. And before you start talking, let me remind the audience, please make sure all your cell phones are off. Thank you. May it please the Court. Again, Assistant State's Attorney Brian Levitsky on behalf of the people who stated their own error. I would actually like to start off by agreeing with counsel about one thing. There were 23 witnesses who testified in this case over the course of 14 days of testimony, and the Court considered over 100 exhibits. But what counsel fails to recognize is that after all of this evidence was before the Court, the Court issued an order which detailed its reasons finding why none of the more or less claims that Petitioner raised afforded him a new trial. And the standard is not simply deniable because the Court found some of the witnesses credible. It's manifest error. As much as counsel may disagree with the findings that the Court made in this case, the question is whether the error was clearly evident, and it's not, because each of the Court's findings in this case were well supported by the record. I'll start with the three issues that counsel did. Just briefly, I think that if we look at these a little bit more closely, that we're going to see that there are no questions as to whether or not John Galvin actually committed this offense, let alone that he failed to show that he was actually innocent. Counsel, other than his confession, what's the other evidence that shows that he committed this offense? So we can start off with the fact that Ramirez identified him as being present in the area, and we can look at the fact that he was there. He was present in the area? Right. Okay. So we have him there, and we have Socorro Flores, who testified that she was up at 4 o'clock, not making breakfast. She was actually making lunch for her husband, who was going to leave for work at 5.30 that morning. She looks outside the window, and she sees these group of individuals, and it's not just something that's in her hand that she sees in one of these individuals. Did she identify the defendant? She said she couldn't make an identification. Okay. So I'm asking about what is it that, other than his confession, that ties this defendant to the crime. So far, you've said he was in the area. The neighbor saw some people, but she wasn't sure, but she couldn't identify the defendant. So we still just have the confession. What are the other things? Well, what I was getting to is the fact that the confession and Socorro Flores' testimony, and even seen through the lens of Dr. Edel's testimony, were entirely consistent in his compelling evidence that the confession was not coerced. It was, in fact, correct. How so? Well, let's look at what Dr. Edel actually testified to, because his testimony supports the conviction in this case. What he testified to was, within a reasonable degree of scientific certainty, that this was an incendiary fire, but that means it was deliberately set. He also testified that it was entirely possible that it was set by the lit rag. Who tells us if it was a lit rag? Not only Socorro Flores, but John Galvin. Also, he says that he couldn't identify the liquid accelerant. Also, he says that it's incorrect, that the cigarette could have started a small fire. But that's not really the issue here. The issue is whether John Galvin has shown that he's actually innocent, and he hasn't, because his confession is entirely consistent with his Molotov cocktail being thrown against the building, as Socorro Flores saw, and him being there, as Jose Ramirez told us as well, and that fire resulting in the death of Julio and Guadalupe Martinez. Isn't our standard of view here, it is manifest error, all right, I'll give you that, and that means you have to probably show it probably would change the result of the trial. I don't think it's, the defendant's not required to show he's innocent, is it? Only that it would change the result of the trial, and the result of the trial hinges on whether the state can prove him guilty beyond a reasonable doubt to a reasonable jury. So actual innocence doesn't really mesh with a reasonable doubt or sufficiency of the evidence. It's not whether or not the defendant, 30 years after the fact, after he's already filed his direct appeal, after he's filed his first conviction, after he's filed his federal appeals, can find a little bit more reasonable doubt. It's the hallmark of actual innocence. It's not maybe I didn't do it, it's I didn't do it, and that's what he failed to show in this case. Let's talk about Ramirez for a minute. Absolutely. Was there testimony from Mr. Partita about his physical condition that night? I'm sorry, I didn't hear the second part. Was there just Mike, Mr. Partita at the evidentiary hearing about his physical situation or condition that night? So there was testimony at the hearing about not only the fact that he had been drinking, which Ramirez readily admitted. In fact, he used that initially to try to get out of testifying by telling the police that he was drunk, which shows the fact that he is maybe, you know, extremely unbiased, especially when you compare him with Partita. But after Partita files this or signs this first edited in 1995, which doesn't mention all these wiki sticks or wacky sticks or whatever, and after he signs another petition in 2001 not mentioning this, finally in 2004 he decides, you know what, there were also TCP-based marijuana or whatever it was. So the jury already knew from Ramirez himself that he was drinking that night. And Partita tells us that... The jury never heard from anybody else to say what his condition was, correct? This is the new evidence that's brought forward in this evidentiary hearing, Partita evidence. So we understand the jury never heard, but no one was able to say what his condition was other than was Mr. Ramirez cross-examined on that at trial as far as his condition? He admitted that he had been drinking that night. He was cross-examined on it. It was in the police reports. He said that he was drunk because he was trying to get out of testifying to this because he didn't want to be there. The jury knew that, which is why even if this isn't rediscovered evidence, which is itself questionable because Partita's name is all over the police reports and he's mentioned at trial. But he didn't testify. See, counsel, now come on. All over the police report? Right. I think what I'm concerned about is did the jury hear from him? Whether his name is all over the police reports or not is really irrelevant, isn't it? Well, no, for two reasons. First off, the question is whether or not through due diligence counsel could have found this. Here's another thing. Let's put this case into its procedural context. Because one thing that we never heard from Petitioner in his briefs or even in the presentation that we just heard today is the procedural nature of this case. Again, we had a direct appeal. We had the first post-conviction. We had the federal habeas. And now here we are again. What happened at the first post-conviction? He raised the same claim of ineffective assistance of counsel for failure to call Partita. I understand. But it's important to remember that we're talking about claims that are barred by less judicata and waiver. What about fundamental fairness? Does that enter into this at all? So fundamental fairness in terms of the due process right to present an actual innocence claim might allow a defendant to present this claim without having to show cause of prejudice in terms of filing successive petition. But then we also have this issue of whether or not it was even proper for him to have raised it in the first place, which we've contended since 2004 that this claim was properly barred. Counsel, can I ask you about Isaac's testimony, the brother of the defendant? Sure. He was at the evidentiary hearing, correct? He was. He testified at the evidentiary hearing? Yes. He did not testify at trial? He did not testify at trial. And he testified that he was questioned for 11 hours, and he overheard crying and yelling and noises from his brother who was nearby in an accompanying cell, right? Right. Do you think that's new evidence? So it's the evidence that the jury didn't hear. The question is, does it show actual innocence? No, it doesn't. Would it change the result possibly if the jury did hear it? I believe that what the trial court found after listening to Isaac Elvin as well as all the others, all the witnesses who testified in this case, is that they're fairly incredible. Do you think that Isaac was incredible, the trial court, at the evidentiary hearing? I don't remember seeing that in the trial court's ruling. I don't know if you talked about Isaac. Yeah, I apologize. I don't think that Isaac was specifically mentioned. Right. But his testimony was not that he was incredible, which is why the trial court properly denied it. But that's your determination, not the trial court's determination. The trial court found that none of Petitioner's claims were meritorious. But he didn't specifically address Isaac, is my point. No. Didn't Isaac Elvin always say, say as well, when he saw his brother going to the lineup, he said he looked like a zombie and he had marks on his forehead? The trial court specifically said no one noticed anything about the defendant having bruises or discoloration or anything. Although the trial court didn't, in this case, make those specific credibility findings as to Isaac, what it also noted is that John Galvin, Arthur Almendarez, and Michael Almendarez viewed photographs and could not identify any physical marks on any of them or Francisco Ananas, consistent with what they claimed to be hours and hours of physical torture. When were the pictures taken relative to the lineup? I believe it was within days. Well, that's what I'm saying. At the lineup, right after he claims he was beaten, his brother saw him and said he saw marks on his forehead. The photos were taken sometime later. That's correct. Okay. But the fact that there were no marks that were visible in any of these, in fact, when the defendant himself was confronted with as a child, the only thing he could point to was the fact that his hair was a little messed up. That was the evidence that he could show. When he argued to the jury that his statements coerced, he looked at the photograph of himself at the lineup that was taken after his statements and said my hair was messed up. Did the jury hear any testimony from anyone about the coercion that the defendant claimed to be doing? I mean, that's what it amounted to. He claimed he was beaten. Did the jury get to hear that? That's the first part of my question. And the second part is, if they did, could that have made a difference in the outcome of this trial? Yes and no. They heard it from the defendant himself, and they rejected it when they found him guilty. And, again, we're looking at these claims that were brought after the defendant himself changed his story several times. First, he filed a motion to suppress statements where he fully negated the voluntariness of his statement, and he claimed at that time it was psychological and mental abuse. Then he testified at trial that he was physically coerced into the statement. And don't sometimes defendants rely on their lawyers to come up with these things, and they're guided by what their lawyers tell them the right thing to do? And didn't his trial lawyer say he doesn't remember any of this? His trial attorney said that he didn't recall it. That's correct. Let me ask you to address an interesting argument your opponent makes. It's actually a footnote. As I understand, if we take his confession at face value, the fire began because he threw a lit cigarette, right?  So we have the testimony of Detective Switsky who says that when he initially spoke to John Yelvin, he says that they threw the Molotov cocktail, it didn't initially light, he threw the cigarette, and then it lit. So the cigarette was necessary to ignite the fuel in the Molotov cocktail, right? I can't say that for two reasons. First off, we have the second, the court-reported statement, the one that we have that didn't rely on Detective Switsky's memory but is actually in writing, is he says that he threw the Molotov cocktail, it set on fire, and then he threw the cigarette, but set it on a small fire. So we do have two different versions of events. But the question is, does any of this show that John Yelvin is actually innocent? And the answer is no. It shows that, at best, he didn't understand how the fire started. But he put himself there. He testified to the same scenario that's consistent with what Sikora Forrest told us and is, frankly, consistent with what Dr. Bogle told us, who, again, concluded within a reasonable degree of scientific certainty, this wasn't an accidental fire, it was deliberately set. Let me ask you about motive here. There was some kind of testimony trial about motive, why the fire was set. And I think it was inferred or it was testified to that Mr. Galvez had a grudge against the Villalobos because they had done something to him not too far distant past from this incident, right? Correct. So the fire that was started, though, wasn't set at a house that belonged to Villalobos members, but it was Latin King members, was it not? That is also correct. Right. So that was the motive that was offered by the state. So we have to take a step back because, together, everything that you just said is correct, but the question is does it show actual innocence? And so let's go through it a little bit more slowly. What Galvez always claimed was that two weeks before the fire, in this case, he was driving along and he got shot at by Villalobos. So it wasn't just something happened. He was shot at. He was targeted. And then he testified through the court reporter that he was going to target this house because he believed that Villalobos lived there. Does the fact that it was actually the people there that claimed to be Latin Kings change the fact that he targeted that house because he thought that he was going to kill Villalobos? No, it doesn't. It makes the fact that he was mistaken about who he was killing perhaps correct, but it doesn't take away from the fact that he killed Julia and Guadalupe. Counsel, let's talk about the pattern of police abuse testimony and the trial court's handling of that. Do you think that was sufficiently explained by the trial court as to why he discounted all of that testimony? Absolutely. Explain to me why. So I think that we've, in our briefs I think we've laid out the details as to how the court found specific instances of what they said impeached, but I do want to just address that more generally. The court listened to these individuals testify and found that none of them are credible. After explaining in its own written order what its findings were, it said that the persons weren't credible, and it doesn't lead to the conclusion that either Galvin or Almendara's request to confess for involvement, not just because of the testimony that they provided that day, but also because of the timeline where Galvin claims that he was abused hours and hours and hours into the night and that his confession led to the arrest of Arthur Almendara's hours later. So there is an inconsistency which the defendant can't explain. And the court also looked at the photo, one of the photos, which revealed no injury, which we've already talked about. And it also looked at the fact that the jury heard from the defendant's own mouth at trial that he was physically coerced, and the jury didn't believe him then either. As well as defendant's testimony at the hearing itself, which wasn't credible. And I didn't want to touch on the standards of the... Let me ask you something about this. I mean, we do know that coercion has taken place. I mean, we've seen those cases. You've seen them. I've seen them. And we do know that confessions are coerced, and sometimes, you know, the defendants are beaten. How else would he communicate that other than what he did? I mean, is there some other mechanism for him to communicate that to the court? I mean, you're saying, well, nobody believed him. But is there some other way that he would have communicated? And is the fact that nobody believed him sufficient for us? We are an appellate court, so we get to look at it and say, well, look at all these other things. So are you saying the fact that no one believed him, that should be the end of the story and we can all go home? Well, he could present credible evidence, number one. And what would that look like? Well, let's compare this case to Wuerl because the defendant asked us to do that. What happened in Wuerl was he had a defendant who claimed that he was coercing to a confession at Area 2. We have, in this case, Detective Switsky, who previously hadn't had any such connection to the Burge case. But instead, the defendant was able to find some individuals who were also pursuing post-conviction claims. In some cases, in some cases wanted. Money, in some cases, testified. In the case of, I believe it was Michael Almendarez. Counsel, your editorial comment is notwithstanding. I think we can all agree that there have been Chicago police officers who have beaten people. You're saying it in a way that it's almost offensive because you're suggesting that, oh, well, he beat the bushes and found these people who some of them wanted money. All by the same detective. I think we can all agree that there are Chicago police officers who have beaten people and gotten confessions out of them. So I'd like you to address it in that way because we've read the same material that you've read. And I take some umbrage with you saying it in the way you've said it because I don't think that's accurate. I apologize, Your Honor. I certainly didn't mean to offend or cause umbrage. I was hoping to just draw some distinctions between this case and Will, but just looking at the facts in this case, it's whether we look at the defendant's statements by themselves or together, the fact is that we have to remember where we're at. We're at a third stage evidentiary hearing, which was conceded by the court. We can disagree in terms of the specific credibility findings, but in the manifest way of the evidence standard, can we say that Judge Joyce was wrong in any of these findings? Were each one of the individuals who testified, in terms of a pattern, Holman, Mitchell, Carey, Sutter, Holman, Cole, and Fisher, he found them to not be credible based on their testimony and the fact that they had given prior inconsistent statements or that they had chosen not to present any such evidence in 30 years? That's not manifestly erroneous. That's the standard that the defendant has stated. You have about a minute left. I'm sorry? You have about a minute left. Oh, thank you. If you want to talk about the Batson issue in this case, because, again, we have to look at where this argument is coming into the context that it originates from. Defendant litigated a Batson hearing pretrial before the trial court, contemporaneously with Fort Geer. The court didn't first make an explicit ruling on the prima facie case, but nevertheless asked us for race neutral reasons from the prosecutor and accepted those reasons. So what defendants are really trying to do here is get around the fact that if counsel on appeal was going to try to challenge that, he'd be up against the manifest right of the air as standard again. He couldn't reach it for any of the other claims, and he can't reach it here, where the issue is already litigated. And power simply doesn't help him. Where the court already ruled on his factors, as well as for the third-party claim that he's attempting to make here today, the only way he really gets there is by adding all the specific categories of racial minorities together. And we know from Harris, as well as from Rivera, that that's simply not the appropriate analysis to take. So all he really has is just numbers, frankly not strong numbers, but by itself was never enough to make a prima facie case in this instance. And one thing I did just want to address about this before wrapping up is that counsel tries to beef up this prima facie case by knowing that the prosecutor apparently took notes on the race, and it's really not surprising that in a post-facet world that a prosecutor would take this into account, anticipating that this type of motion could be made. That's why we have the record that we do. It's not because the prosecutors were attempting to remove any veneer persons simply because of their race. In fact, as the court noted, two African Americans were seated, which is strong evidence against a prima facie showing. Were any Hispanics seated? Your Honor, I don't recall that there were. However, again, I would just reiterate that the court did accept that there were essential reasons as to the Hispanic jurors, as well as noted that the defendants and the victims and most of the witnesses in this case were also Hispanic. Your Honor, just in summation, what's evident from the record in this case is that it doesn't show that John Galvin is actually innocent. It simply doesn't. If anything, Dr. Ogle's testimony helps show us that the jury got it right 30 years ago, and that if this case went to retrial today, we can be assured that we get it right again. Prakita is not newly discovered. He's a thoroughly incredible witness. Velez made the same threats directly to Jorge, who testified about it. And actually, I apologize, the issue wasn't that they couldn't show Velez's absence. The issue was that a defendant tried to get this evidence in through chambers, and the court found that it wasn't reliable under chambers. For the same reason he can't show that Velez's testimony shows that he's actually innocent, because Lisa Velez never said that she did this. She just said that she had a motive. Frankly, defendants are much stronger because he was specifically targeted. And for these reasons and the reasons stated in our brief, but more so because the law and the evidence compels it, we would ask this Court to affirm the ruling of the lower court. Thank you. Ms. Thompson, let me ask you a housekeeping question before you launch into what you want to talk about. Is there anything simultaneously going on with the Torture Commission on this, with respect to the three, this defendant and the two co-defendants? Not that I'm aware of, Your Honor. Okay. So that's off the table, as far as we know. At this point, it is, Your Honor. I want to be responsive with my time to the questions of this Court,  because it is not true that everything this Court is doing in looking at this record is assessing manifest error. I mean, there is a mixed question here, which does make it a little complicated. It is a manifest error standard, and the Court pointed this out, as to the specific credibility findings that the lower court made. But it's de novo in assessing materiality, in assessing whether this would change the outcome, and it's de novo for all the witnesses this Court did find credible. It found Jane Borey's credible. It found Dr. Over credible. There's other people the Court's alluded to that this Court didn't say, I'm rejecting it because I don't believe it. I mean, the underlying point of everything the Court did is say, I'm rejecting this because I just don't think it would make a difference. And that's really an issue this Court should look at de novo. A couple of factual things I want to clarify. So Coral Flores didn't say, I don't know who that person was. I mean, she was asked, and the Court can look at her testimony. She's asked in open court, you know, is John Gelbin one of the people that you saw in the alley? And she says, no. She doesn't say, I'm not sure. She says, no. You know, this is not an issue of Jose Ramirez, you know, adding something to a person who didn't know what they saw. That's just not the question here. She also didn't say she saw lit rags. She said there was something in this person's hand. So we're left with a lot of questions about what happened with this fire. On Frank Partita, who I've talked about some, the Court really did two things with Frank Partita. It really said nothing about Frank Partita's testimony that, you know, unlike Jose Ramirez, you know, denying vociferously at trial that he was intoxicated, you know, saying this is a guy, he and his friend had trouble walking. That's how impaired they were. The Court really, on the basis of the cold record, did look at these differences in the affidavits over time and say, you know, those differences to me mean that we've got to reject what Frank Partita said entirely. And it's erroneous to do that in the context of assessing whether Frank Partita would change the outcome. It's erroneous to do that in a situation where we're talking about testimony that starts in 1995 and goes to the present. It's erroneous to do that in a situation where Mr. Partita is not always the one writing the affidavits, where he's writing things that obviously counsel's making an assessment about what's most useful. And that doesn't mean that there's not impeachment there. I mean, there certainly is. It's a slightly different version each time. The question is still, would it make a difference? And that's the issue on which Mr. Galvin prevails as to Partita, looking at him in the correct context. The Respondents said a lot about what the standard is here. And it's just said repeatedly, you know, he has to show his, you know, affirmative, actual innocence, that it's not enough for there to be just sort of a little more reasonable doubt. This isn't total exoneration. I mean, again, the Court knows what Coleman has said about this issue. It is Mr. Galvin's burden. It's a burden he embraces. It's a burden he embraced below the lower court. The question is, you know, is it more likely than not that this evidence would make a difference? And we are talking about his, the State being able to meet its burden in that situation. We're not talking about him affirmatively proving his innocence. We're talking about where is the reasonable doubt. And we have it here in States on the basis of everything that this jury did not know. This was never a slam dunk case. And the Court, I think, has identified those issues already. There were some reasons to disbelieve Jose Ramirez even at the outset. There were, you know, reasons to look at what Socorro Flores was saying. And there was everything that Mr. Galvin has said from the beginning as best he could about the reasons why he gave these statements. We now know the whole story. And so when the Court in Coleman talks about the evidence being sufficient to undercut confidence in the guilty verdict, I mean, that is what Mr. Galvin is asking this Court. Can this Court say that its confidence in this verdict remains? Given everything that we now know, there's no way. And so in closing, I would just say this, which is Mr. Galvin is not asking for a get-out-of-jail-free card. He's not asking for this Court to send him home. He is asking for a fair trial. I mean, he's asking for an opportunity to show the jury all of this evidence and to have a jury deliberate about it and reach a decision. And it is more likely than not that that jury is going to look at all this evidence and say, we cannot return a guilty verdict for Mr. Galvin. But he wants a chance to do that. And that's what we're asking for. The U.S. Constitution and the Illinois Constitution compel that verdict in this case, Your Honors. Thank you. Thank you, Counsel, for your arguments. The Court will take the matter under advisement. There are no other cases on the agenda for today, so with that, Court will stand in recess.